Birdie Amsterdam, J.
Plaintiff landlord instituted the instant lawsuit for a judgment declaring the New York City Rent and Rehabilitation Law (Local Laws, 1962, No. 20 of City of New York, as amd. by L. 1963, ch. 100) null and void and for a permanent injunction restraining the defendant, Rent and Rehabilitation Administration, from executing the powers delegated to it pursuant to said enactment. To sustain its position regarding the present legal status of the City Rent and Rehabilitation Law, the plaintiff assails the City Council’s finding of a public emergency in housing, the indispensable predicate for the validity of the New York City Rent and Rehabilitation Law pursuant to the authority delegated by its enabling act (Local Emergency Housing Rent Control Act; L. 1962, ch. 21) and pursuant to the Constitution of the United States and the Constitution of the State of New York. Issue having been joined, the defendant at this posture of the action has invoked the power *890 of the court to dismiss the complaint for want of merit and to grant summary judgment for defendant.
The judicial propriety of summary judgment — the substitute for judgment after a plenary trial in an action in which the papers generate no triable issue of fact — cannot be ascertained by any talismanic test. The very threshold question, i.e., the existence or absence of a triable issue, cannot be determined within the context of a theoretical vacuum. A motion for summary judgment necessitates a full consideration of the law and of the facts.
Although the inception of regulation and control of residential rents and evictions to combat the threat engendered by World War II to the public health, safety, morals and welfare can be definitively traced to 1942, the transfer of the responsibility from the State to the City of New York to protect its people from the dangers of the war-generated emergency provides the chronological starting point for the historical background of the matter now before this court. Effective May 1, 1962, the State authorized and empowered the City of New York to administer locally the State policy of temporary emergency regulation and control of residential rents and evictions. At that time, the State Legislature determined that “ a serious public emergency continues to exist in the housing of a considerable number of persons in the state of New York * * * there continues to exist an acute shortage of dwellings; that unless residential rents and evictions continue to be regulated and controlled, disruptive practices and abnormal conditions will produce serious threats to the public health, safety and general welfare; [and] that to prevent such perils to health, safety and welfare, preventive action by the legislature continues to be imperative (Local Emergency Housing Bent Control Act, § 1, subd. 2; L. 1962, eh. 21.)
Consonant with the far-reaching delegation of jurisdiction to the city, the Local Emergency Housing Bent Control Act provided that: “ [t]he continuation, after March thirty-first, nineteen hundred sixty-four, of the public emergency requiring the regulation and control of residential rents and evictions within cities having a population of one million or more shall be a matter for local determination within each such city.” (§ 1, subd. 3, as amd. by L. 1963, ch. 398.) Such authority to determine the city’s statutory and constitutional bases for power was confined within the bounds of explicitly enunciated standards. “ Any such determination,” the act prescribed (§ 1, subd. *891 3), “ shall be made by the local legislative body of such city on or before February first, nineteen hundred sixty-four and at least once in every second year thereafter following a survey which the city shall cause to be made of the supply of housing accommodations within such city, the condition of such accommodations and the need for continuing the regulation and control of residential rents and evictions within such city. Such survey shall be submitted to such legislative body not less than thirty nor more than sixty days prior to the date of any such determination.”
In compliance with the aforesaid statutory directive, the city, in 1962, engaged the United States Bureau of the Census to conduct a survey of New York City to ascertain the percentage of housing vacancies then existing and to prepare a comprehensive statistical tabulation of the condition and characteristics of the renter-occupied housing and households by rent control status.
After the lengthy project was completed, the Bent and Behabilitation Administrator embodied the Census Bureau’s exhaustive and detailed findings in a report, “ People, Housing and Bent Control in New York City” and submitted the report together with her recommendations based thereon to the Mayor who, in turn, transmitted the documents to the City Council on December 16, 1963. The salient factor of the Administrator’s report was the Census Bureau’s determination that the net rental vacancy rate for New York City was 1.79% — a vacancy rate which, allowing for differences in the method of computation, was equivalent to the 1960 figure which had served as the statistical basis for the 1962 declaration of an emergency.
On January 8, 1964, the City Council referred to its Committee on General Welfare a resolution incorporating the Administrator’s recommendation that “ [t]he public emergency requiring the continuance of rent control still exists.”
The Committee on General Welfare, after formal public notice in accordance with law, held a public hearing on January 23, 1964, at which time opportunity was afforded to some 173 persons and groups who sought to be heard. At the hearing, plaintiff’s present attorney as representative for the “ Metropolitan Fair Bent Committee ” spoke in opposition to the proposed resolution and submitted to the committee the same “ Memorandum to the City Council of New York on Bent Control ” upon which plaintiff predicates its position on the present motion and the action now before this court.
*892 Examination of the voluminous transcript of the January 23,1964 public hearing discloses that each of the two extensively documented reports now before the court, “People, Housing and Rent Control in New York City ” and “ Memorandum to the City Council of New York on Rent Control ”, represents the embodiment of one of the two antipodal recommendations to the City Council regarding rent control.
“ People, Housing and Rent Control in New York City ”, the basis for the Rent Administrator’s recommendation, presents a comprehensive study in depth of both the city’s rental housing inventory and of the families that occupy these rental accommodations. The report statistically tabulates and analyzes the city’s housing accommodations in terms of age, over-all condition, rooms, kitchen equipment, plumbing facilities, and rent as well as other categories and the city’s renter households by number of persons per room, mobility, age, income, color, ethnic group and other characteristics.
The “ Memorandum to the City Council of New York on Rent Control ” analyzes the city’s housing supply with emphasis bn the physical condition of the city’s housing inventory under rent control, the relative indices for rent, construction cost, food and apparel during the period of rent control, the effect of rent control on improvements to the city’s housing inventory, the landlords’ net income and the capital value of housing, and the effect of decontrol in other major cities in the United States.
Scrutiny of both reports compels four principal conclusions. Firstly, the interpretation and significance, not the accuracy, of those statistics which are common to both reports constitute the critical difference between the two antagonistic positions. The “ Memorandum to the City Council of New York on Rent Control ’ ’ wherever available adopts the statistics of the Bureau of the Census. Indeed, in his testimony before the Committee on General Welfare, counsel for plaintiff indicated that interpretation not the accuracy of the figures contained in “ People, Housing and Rent Control in New York City ” constituted the basis of disagreement (Public Hearing of City Council of City of New York, Jan. 23, 1964, pp. 15-44). The crux of plaintiff’s and the Metropolitan Fair Rent Committee’s position emerges clearly from the introduction to ‘ ‘ Memorandum to the City Council on Rent Control ” which is captioned “ The Report of the City Rent Administrator Compels the Conclusion that Rent Control is no Longer Permissible. ”
Secondly, the ultimate divergence in the material presented in both reports represents a difference as to the emphasis to be *893 accorded the economic status of the tenant in determining the existence of emergency. “ People, Housing and Bent Control in New York City” devotes a large portion of its study to the statistical delineation of the rent controlled household and the economic effect of decontrol upon these families. The ‘ ‘ Memorandum to the City Council of New York on Bent Control” postulates the opposing thesis. “It is the apartment, not the occupant, that must be evaluated * * *. Therefore rent regulation ”, argue the proponents of decontrol, at page 7, “ cannot rest on the particular needs of an individual tenant or any class of the population. In short, rent control cannot be justified as a relief measure, however justified relief may be.”
Thirdly, the “ Memorandum to the City Council of New York on Bent Control ” presents material which “People, Housing and Bent Control” expressly states at page VI, “cannot be answered by the Census data in the present report [namely], analysis of comparative levels of operating and maintenance expenditures, and expenditures for improvement, for controlled compared with uncontrolled properties; the comparative rates of return to property owners of controlled and uncontrolled units and the effect of rent control upon capital values of controlled properties. ’ ’
Fourthly, “ People, Housing and Bent Control in New York City ” adopts, and the Bent Administrator emphasizes, as the critical factor in determining the existence of emergency, the net rental vacancy rate as opposed to the “ Memorandum’s ” contentions that any vacancy rate per se ‘1 provides little meaningful aid in analyzing the housing situation ” in New York City at the present time and that of approximately five different vacancy ratios the least valid index of shortage is the net rental vacancy rate which excludes units (1) rented seasonally, (2) rented but not occupied, (3) used as an occasional second residence, (4) held off the market because of pending litigation, etc., (5) held by a business firm for entertainment of out-of-town visitors and personnel and (6) those in a dilapidated condition. Nowhere does the plaintiff controvert either the accuracy of the Census Bureau’s finding of the 1.79% net rental vacancy rate or the equation of this rate with the 1960 figure which served as the statistical basis for the finding of emergency in 1962. In a supplemental memorandum to the City Council the Bent Administrator set forth the historical reliance upon vacancy rates as the decisive factor in ascertaining the existence of a state-of-emergency shortage of housing.
*894 After consideration of “ [t]he survey, the report of the City Bent and Rehabilitation Administrator and all of the testimony and evidence adduced at the hearing ’ ’ (Report of the Committee on General Welfare, City Record, Jan. 30,1964, 997-998), the committee reported to the City Council that:
“ The United States Bureau of the Census finding that the vacancy rate in the city is 1.8 per cent indicates that no appreciable lessening of the existing emergency in the shortage of residential housing has occurred since the Council’s last review in 1962. (Emphasis supplied.)
“ On the basis of all of the facts, and of our own knowledge of current conditions, it is clear that the emergency requiring the regulation and control of residential rents and evictions in New York City exists and will continue to exist beyond March 31st, 1964, and that the continuance of such regulation is required in order to protect tenants from unjust, unreasonable and oppressive rents, and to protect the public health, safety and general welfare.
‘1 After due study and consideration, we recommend that the Council adopted [sic] this proposed resolution.”
The City Council then adopted the proposed extension of regulation and control of residential rents and evictions within New York City, the pertinent parts of which resolution read: 11 [T]he Council hereby determines that the public emergency requiring the regulation and control of residential rents and evictions within the City continues to exist and will continue to exist after March thirty-first, nineteen hundred sixty-four in the housing of a considerable number of persons in the city * * * that there continues to exist and will continue to exist after March thirty-first, nineteen hundred sixty-four an acute shortage of dwellings; that unless residential rents and evictions continue to be regulated and controlled, disruptive practices and abnormal conditions will produce serious threats to the public health, safety and general welfare ”.
The challenge to the City Council’s afore-stated finding of public emergency and to the validity and constitutionality of the statute predicated thereon constitutes the basis for the controversy now before this court.
Decisional precedents have clearly enunciated the nature of the police power of the State and the legal standards to test the constitutionality of a legislative enactment to vindicate society’s interest in the public health, safety, morals and welfare.
*895 An exercise of the State’s police power to protect the public from a specific substantive evil inexorably gives rise to a concomitant legal restriction upon some members of the community. The essence of the police power is the redress of the de facto balance of the market between consumer and producer, debtor and creditor, employee and employer, and tenant and landlord. Arguments challenging this legal concept of the role of the State must be classified as anachronistic vestiges of a day long since past when the right of property was deemed to be permanent and absolute. (See Carduzo, Growth of the Law, p. 72; Teeval Co. v. Stern, 301 N. Y. 346, 362.) The law has long recognized that “ a business strictly private in one set of conditions, may through other and new conditions become quasi-public overnight. The owner of land and buildings may find himself restricted in the rent that he is free to charge if the emergency is pressing enough to make the restriction necessary as a means to social justice. At such times, no antecedent contract will be permitted to stand in the way of the power of the state to promote the welfare of its citizens by protecting them against the encroachments of a rapacious individualism.” (Cardozo, Paradoxes of Legal Science, pp. 130-131; East N. Y. Sav. Bank v. Hahn, 326 U. S. 230 ; Home Bldg. & Loan Assn. v. Blaisdell, 290 U. S. 398.) Every private contract is subject to the paramount authority of the police power of the State and carries with it this inherent infirmity (paraphrasing Holmes, J., in Hudson Water Co. v. McCarter, 209 U. S. 349, 357).
To sustain constitutionally such superimposition of the police power of the State upon the rights and obligations of the individual, however, the legislative finding of a substantive evil threatening the public safety, health, morals and welfare must be predicated upon a rational basis and the statute must be reasonably appropriate to curb the danger to the public welfare.
In thus testing’ the constitutionality of a legislative enactment, the judiciary in its role as ultimate arbiter of the constitutionality of a legislative enactment may not arrogate to itself the power of a “ super-legislature to weigh the wisdom of legislation ” (Day-Brite Lighting v. Missouri, 342 U. S. 421, 423). Reasonableness, not wisdom nor desirability, of the Legislature’s prescription to prevent or cure the ills of the community is the juridical touchstone (Ferguson v. Skrupa, 372 U. S. 726).
“ [Ñ] othing but a clear violation of the Constitution will justify a court in overruling the legislative will. Every statute *896 is presumed to be constitutional, and every intendment is in favor of its validity.” (Matter of New York El. R. R. Co., 70 N. Y. 327, 342.) This presumption of constitutionality, however, is not irrebuttable (Defiance Milk Prods. Co. v. Du Mond, 309 N. Y. 537, 540-541), and when an enactment is challenged, it becomes incumbent upon the judiciary to scrutinize the legislative act to test the rational basis for and the reasonableness of the exercise of power. (See United States v. Carolene Prods. Co., 304 U. S. 144; Lincoln Bldg. Assoc. v. Barr, 1 N Y 2d 413.) But, “ so long as there can be discovered ‘ any state of facts either known or which could reasonably be assumed ’ to afford support for the legislative decision to act [citing cases] ” (Lincoln Bldg. Assoc. v. Barr, supra, p. 415), and so long as the action bears a reasonable relationship to the protection of the public safety, health, morals and welfare, the legislative decision must prevail.
Application of these legal standards to the case now before this court dictates the conclusion that the challenged legislation is both constitutional and within the power delegated to the City of New York by the State enabling act. The City Council did not act arbitrarily in selecting specific criteria — a net rental vacancy rate of 1.79% within the context of the limited number of vacant apartments with two or more bedrooms and the economic status of the rent-controlled householder — all factually undisputed — upon which to predicate the finding of emergency, nor can it be gainsaid that such factually uncontroverted data afforded a rational basis for the legislative determination of emergency. (See Matter of Hotel Assn. of N. Y. City v. Weaver, 3 N Y 2d 206, 215.) The New York City Bent and Behabilitation Law as a means to curb the challenge to the public health, safety and welfare “may be wise or unwise. But relief, if any be needed, lies not with [the courts] but with the body constituted to pass laws ” (Ferguson v. Skrupa, supra, p. 732).
Summary judgment for the defendant is accordingly granted. In no way, however, to repeat the caveat of the Court of Appeals in Lincoln Bldg. Assoc. v. Barr, 1 N Y 2d 413, 420 (supra), is this decision determinative of the constitutionality of regulation and control of residential rents in the City of New York in any later year. ‘ ‘ Whether and for how long the Legislature may lawfully continue * * * rent control must, and shall, be a question open for future review ” (ibid, p. 420).