Margaret Mart J. Mangan, J.
The plaintiffs, husband and wife, are tenants of the luxury apartment building at 30 Beekman Place, whose apartment was decontrolled on October 1, 1964, pursuant to Local Law No. 13 of the City of New York for the year 1964. Defendant is the City Rent Administrator. Heretofore, on October 26, 1964, this court denied the plaintiffs ’ motion for an injunction pendente lite to restrain the defendant from enforcing Local Law No. 13 and granted permission to Transnation Realty Corp., the owner of premises 30 Beekman Place, to intervene. Both the defendant Rent Administrator and the landlord intervenor now separately move pursuant to CPLR 3211 (subd. [a]) to dismiss the complaint in the instant *888 action for a declaratory judgment in which the plaintiffs seek a judicial determination declaring Local Law No. 13 invalid, and for a permanent injunction restraining the defendant from enforcing that law. The motions are herein consolidated and disposed of together. Local Law No. 13 (Administrative Code of City of New York, § Y51-3.0, subd. e, par. 2, subpar. [i]) was enacted on March 26,1964. It provided that vacant apartments having a maximum rental of $250 or more per month as of April 1, 1960, be decontrolled immediately. In a graduated time sequence, it provided for occupied apartments at $250 to $300 to go out of control on October 1, 1964, excluding to June 30, 1965, families with children in elementary and secondary schools, and excepting apartments housing four related persons or more to go out of control only on vacancy.
The apartment occupied by the plaintiffs at 30 Beekman Place was rented at $332.12 a month as of April 1, 1960.
The challenged complaint in substance alleges that under section 2 of chapter 21 of the Laws of 1962 of the State of New York the State transferred to New York City the power to continue rent control legislation if the city cho'se to use that power: that by directive, section 3 of chapter 21 of the Laws of 1962, as amended in April, 1963, the city was required to make a biennial survey to determine if the emergency requiring rent control should continue to exist, which survey had to be submitted to the City Council of the City of New York not less than 30 nor more than 60 days prior to the date of any such determination ; that a survey was taken and submitted to the City Council on or about December 16, 1963, which indicated a vacancy rate within the city of 1.8% as of December, 1962; that on January 23, 1964, the Committee of G-eneral Welfare of the City Council conducted a public hearing and on January 28, 1964, adopted a resolution declaring that there still existed an emergency housing shortage within the City of New York which necessitated the continuation of rent control; that notwithstanding that a general emergency existed, on February 3, 1964, the Committee on General Welfare conducted a public hearing to determine whether the relaxation of controls of high-rent apartments, more specifically as pertained to housing accommodations renting at $250 per month or more, was warranted in the City of New York, within the meaning of section 2 of chapter 21 of the State enabling act; that thereafter the City Council enacted Local Law No. 13, which failed to comply with the mandatory directives of said enabling act, and acted in an arbitrary, capricious, and unreasonable manner; that Local Law No. 13 was violative of the plaintiffs’ rights of due process and equal protection under the *889 Federal and State Constitutions; that the plaintiffs accordingly seek judgment declaring Local Law No. 13 null and void and a X>ermanent injunction restraining defendant from enforcing Local Law No. 13.
The defendant seeks to dismiss, the complaint presented on the grounds that (1) it fails to state facts sufficient to constitute a cause of action, and (2) the defendant has a defense to the action, founded upon documentary evidence.
Treating the motion to dismiss the complaint as one for summary judgment, this court will test the sufficiency of the complaint on the basis of the documented facts. Under CPLB 3211 (subd. [a], par. 1), in keeping with the spirit of the remedy of summary judgment before answer to avoid a needless trial, a liberal interpretation is given to the term ‘ ‘ documentary evidence ”, and in the absence of any issue raised as to the genuineness thereof, the court accepts the documented legislative considerations submitted by the defendant.
The State of New York empowered the city to administer the policy favoring “ the transition from regulation to a normal market of free bargaining between landlord and tenant * * * [as] the objective of state policy * * * with due regard for ” “ a serious public emergency * * * in the housing of a considerable number of persons ”. (L. 1962, ch. 21, § 1, subd. 2.)
The legislative and statutory history of Local Law No. 13 shows that under the directive of subdivision 3 of section 1 of chapter 21 of the State enabling act, requiring a biennial survey to determine if the emergency rent control should continue to exist, the city entered into two contracts with the United States Bureau of Census. The first contract was for a sample vacancy survey of New York City to be carried out in the Fall of 1962, and the second was for special tabulations of the 1960 census data for New York City based upon the rent-control stains of the housing accommodations. The survey taken by the United States Bureau of Census showed an over-all net vacancy rate of 1.79% in housing accommodations in the city. It showed that in the entire city there were only some 8,700 apartments subject to control which had rented at above $250 a month as of 1960. Of these, 82% contained five rooms or more; on the other hand, over 70% were occupied by households of three persons or less. Moreover, the median income of these 8,700 families was $18,500; and where the income was under $10,000, the. apartment was almost invariably occupied by a single person. The survey also showed that as of December, 1962, there were 2,740 vacancies in the city renting at $200 or more a month. A comprehensive study was made collating the data found by the Census Bureau, *890 which was then embodied in a report by the Administrator, “ People, Housing and Rent Control in New York City ”. The report gave the salient characteristics of households in high-rent units, indicating a clear differentiation at the $250 level and concludedit is in the highest rent sector that there has been noticeable easing of the housing market in recent years. This development, coupled with the characteristics of tenants occupying controlled apartments renting at $250 or more, suggests that most of these tenants are in a good position to compete for shelter in a free market.” The report was forwarded to the Mayor, together with a concise summary thereof and the Administrator’s recommendations based thereon (letter to Mayor, dated Dec. 13, 1963) advising that an emergency requiring the continuation of rent control still existed but that the availability of adequate rental housing and other factors made rent control unnecessary for housing accommodations renting for $250 per month or more as of September 1, 1963, provided, however, that suitable safeguards be enacted to insure an orderly transition to a free market, with particular attention to be given to protecting families with children. These documents were then in turn, on December 16, 1963, transferred by the Mayor to the City Council. On January 8, 1964, the Council referred them for study to its Committee on General Welfare with a resolution incorporating the Administrator’s recommendations as to the existing emergency. A proposed bill for decontrol of housing accommodations renting for $250 or more was printed in the City Record on January 11, 1964. Full and proper notice was then given of an open hearing to be held on the bill and the bill itself was referred to the Council’s Committee on General Welfare. The Committee on General Welfare first considered the continuation of rent control as a general proposition and made a detailed report on January 28, 1964, concluding that no appreciable lessening of the existing emergency in the over-all shortage of residential housing had occurred. After consideration of this report and all of the materials on which it was based plus the legislators’ own pooled knowledge of the housing situation in New York City, the City Council on January 28, 1964, adopted a resolution declaring that there still existed in the housing of a considerable number of persons in the city an emergency situation which necessitated the continuation of rent control. The recommendations of the Administrator to decontrol, with suitable safeguards, housing accommodations renting for $250 or more was acted on later. After prolonged deliberations thereon, including a lengthy public hearing and numerous committee hearings, the Committee on General Welfare made a *891 detailed report concluding that housing accommodations renting for $250 or more should be exempted from rent control subject to certain specified safeguards (City Record, Feb. 20, 1964). After consideration of this report, the City Council on March 26, 1964, enacted Local Law No. 13. "Where, as hereinabove demonstrated, a rational basis has been established for the enactment of Local Law No. 13 by documented and unquestioned historical evidence, this court determines the plaintiffs cannot possibly establish any existence of an issue of fact as to the arbitrariness, reasonableness or capriciousness of the Council’s action. Only the claim that there was absolutely no “ rational basis for legislation * * * may * * * be made the subject of judicial inquiry * * *. But by their very nature such inquiries, where the legislative judgment is drawn in question, must be restricted to the issue whether any state of facts either known or which could reasonably be assumed affords support for it ” (United States v. Carotene Prods. Co., 304 U. S. 144, 153-154). Presumption is always in favor of constitutionality, and the law presumes that the “ Legislature has investigated for and found facts necessary to support the legislation ” (I. L. F. Y. Co. v. Temporary State Housing Rent Comm., 10 N Y 2d 263, 269). Unless the action taken by the Legislature is clearly arbitrary, unreasonable, or capricious, it must be upheld by the courts. It cannot be denied, as was noted in an analogous situation to the historic and documented evidence of the instant case, “ the Legislature was not even acting merely upon the pooled general knowledge of its members. The whole course of the * * * legislation shows the empiric process of legislation at its fairest ” (East New York Bank v. Hahn, 326 U. S. 230, 234).
Under the State enabling act, subdivision 3 of section 1 of chapter 21 of the Laws of 1962 of the State of New York as amended, a determination as to whether or not an emergency existed in residential housing was to have been made by the City Council on or before February 1, 1964, based on the official 1962 survey of the United States Bureau of Census. On January 28, 1964, the Council made an over-all finding of emergency in the housing situation in the city and, having then determined an over-all emergency, later, on March 26, 1964, enacted Local Law No. 13, decontrolling housing accommodations renting for $250 or more, subject to certain safeguards. There was no need to make a new survey for the City Council to have excluded the subject premises. Since December 16, 1963, the City Council had before it the report by the Administrator, “ People, Housing and Bent Control in New York City”, and the Adminis *892 trator’s recommendations based thereon to decontrol housing accommodations renting at $250 or more, and was cognizant from that date that, although the vacancy rate of all rent levels of housing in New York City was 1.8%, those apartments renting for $250 or more represented a distinct classification. It would, thus appear that the City Council’s deferment of the question of decontrol to a later date was grounded upon the intention to hold separate public hearings and deliberation so as to best protect the rights and interests of the affected tenants and landlords. Moreover, in addition to the abstract logic that an over-all 1.8% vacancy rate need not mean a 1.8% rate for each segment of the housing economy, the legislative history of both the January 28, 1964, and the March 26, 1964, enactments dictates rejection of plaintiffs’ assertion of any disparity between the City Counsel’s resolution on January 28, 1964, and Local Law No. 13, effective on March 26, 1964.
The defendant asserts that the plaintiffs seek to compel the legislative branch of this city to exercise its delegated power to continue rent control of all housing accommodations comprised in that segment of the economy here affected. If a tenant protected by police power has no constitutional or vested right the termination of the police power cannot produce or create a new right in place of a nonexisting one. There is no vested right in the plaintiffs to have the City Council determine that the existence of an emergency continues in order to have rent control of their subject premises. It is for the City Council to ascertain the continued existence of the public emergency, and the plaintiffs cannot compel such an exercise where the Legislature has declined to exercise it. The cases are legion which consistently express this well-settled principle of law:
‘ ‘ no person has a vested interest in any rule of law or legislative policy which entitles him to have it remain unaltered for his benefit ” (Matter of Eagan v. Livoti, 287 N. Y. 464, 468; Wasservogel v. Meyerowitz, 300 N. Y. 125; I. L. F. Y. Co. v. Temporary State Housing Rent Comm., supra). In exercising the police power to vindicate society’s interest in the public health, safety, morals and welfare, neither the State Legislature nor the City Council ‘ ‘ need not control all rents or none ” (Woods v. Miller Co., 333 U. S. 138, 145). It is the objective of the rent control law and the policy of administering the law to continue controls over those areas of housing where rent controls are needed and to discontinue controls where it can be done without the danger of undue increases in rent, dislocation and hardship. (Local Emergency Housing Rent Control Act, L. 1962, ch. 21, § 1, subd. 2.) The grant *893 of power to the City of New York under the State enabling act cannot be interpreted to require the City Council either to extend or to end rent control for the entire city in one fell swoop. (Ibid.) State and city authorities have adopted the principle of gradual decontrol of segments of the economy where in terms of housing supply and the tenants’ economic ability, they are deemed best able to meet the demands of an unprotected market. On the documented evidence before it, the City Council in essence decided that in view of the large number of vacancies available to smaller families at the $250 or more rent level and the general economic status of the tenants involved, there was no need for the full exercise of its police power to continue rent control at that level. On the question whether the Council, in withdrawing the subject premises from luxury rent control, created a reasonable classification or deprived the plaintiffs of their constitutional right to the ‘1 equal protection of the laws ”, cardinal is the principle that it is permissible to pass legislation on a division by class. In the history of rent controls, it has become customary to first lift controls for small high-rent families because alternative housing becomes available to them first. In 1957, the State Rent Administrator decontrolled apartments of a certain size and occupancy renting at above $416.66 per month, and his ruling was upheld (Matter of 180 East 79th St. v. Temporary State Housing Rent Comm., 18 Misc 2d 539, affd. 5 A D 2d 972). Just so long as a legislative classification is not a wholly arbitrary one, or is founded upon a reasonable distinction or difference, or if any set of facts reasonably can be conceived which would sustain it, then such classification, though discriminatory, is not violative of the equal protection laws (Allied Stores of Ohio v. Bowers, 358 U. S. 522; Woods v. Miller Co., supra; Bucho Holding Co. v. Temporary State Housing Rent Comm., 11 N Y 2d 469; Ampco Print. Advertisers’ Offset Corp. v. City of New York, 14 N Y 2d 11). The separate treatment of the luxury high-rent apartments in Local Law No. 13 was warranted on the basis of the available facts and in light of the available vacancies, the characteristics of households affected and the number of households affected as compared with existing vacancies. Accordingly, on the documented data before it, there was a reasonable basis for the Council to find that the emergency resulting from acute shortage in housing with a rental value of upwards of $250 no longer existed, and to conclude that in going from control to decontrol there should be a carefully-worked-out plan to insure an orderly transition and to avoid uncertainty and hardship to families with children *894 in elementary or secondary schools or where related persons of four or more occupied one accommodation. Moreover, the plaintiffs suffered no prejudicial treatment within the classification, since again the documented data showed a reasonable policy for a differentiation, to permit children of elementary or secondary school age to finish out the school term and to safeguard families of four or more because of the larger number of vacancies available to smaller families at that rent level and the general economic status of the tenants involved. A classification which is thus predicated upon the economic capacity to meet the unbridled challenges of a free market can no longer be challenged as creating inequity before the law (see Russell v. Treasurer, 331 Mass. 501); nor can a classification in terms of varying rent levels per se be seriously opposed (see Matter of Hotel Assn. of N. Y. City v. Weaver, 3 N Y 2d 206; Matter of 180 East 79th St. v. Temporary State Housing Rent Comm., supra).
The City Council on the documented data before it had a reasonable basis to determine in its own wisdom there was no longer any need to continue rent control for luxury apartments. The judiciary is vested with the ultimate responsibility to determine whether a challenged statute is consonant with ■the criterion of reasonableness or whether it constitutes a constitutionally proscribed discriminatory measure. In so testing a product of the legislative process, the court must be ever mindful of its position as a co-ordinate branch of government and where a rational basis has been established by documented and unquestioned historical evidence to the Council to discontinue rent control, the court will not arrogate for itself the authority of a “ superlegislature to weigh the wisdom of legislation ” (Day-Brite Light. v. Missouri, 342 U. S. 421, 423).
Summary judgment was granted in Amsterdam-Manhattan, Inc. v. City Rent and Rehabilitation Administration (43 Misc 2d 889, affd. 21 A D 2d 965) based on a net vacancy rate of 1.79%, and the plaintiffs contend that there the Administrator in her affidavit relied solely on the vacancy ratios as determinative of an existing emergency stating therein “ one index — one decisive test — for measuring the acuteness of the housing shortage creating the public emergency, and that has been the vacancy rate ” and yet on the instant motion the Administrator takes an inconsistent position and disregards completely the vacancy ratio. A vacancy rate is just one index of whether a competitive market exists. The .survey taken by the United States Bureau of Census only gave an over-all vacancy rate *895 of 1.79% for the entire city but did not compute a vacancy rate at any specific rent level for technical and financial reasons. So in the Amsterdam-Manhattan Inc. case when the plaintiff sought judgment declaring Local Law No. 20 (1962) of the City of New York null and void, the Administrator took the position that an over-all net rental vacancy rate of 1.79% in the city in 1962 was a sufficient basis for finding the existence of an emergency requiring the continuation of an over-all rent control, without the need of giving consideration to any other facts or factors. However, in enacting Local Law No. 13, the Administrator properly urges that since there is no definitive vacancy ratio for apartments renting at any specific rent level, the other facts and factors alone are adequate for making a determination relative to housing accommodations renting at $250 upwards. While not expressed in the form of a vacancy rate at any specified rent level, the United States Bureau of Census survey and the comprehensive study thereon showed that the smaller families, constituting most of the controlled tenants in apartments with a 1960 maximum rent of $250 a month or more, had sufficient alternative housing open to them. There was shown to be at least 2,700 vacancies at $200 or more a month available in December, 1962; and, out of a total of 8,700 controlled apartments renting at above $250, some 2.000 were occupied by families of four or more. Since these 2.000 apartments are not decontrolled until they are vacated, it was obvious that the remaining over $250 families had more than enough choices available to them to place them in a normal bargaining position. In 1963, there was also a wave of luxury building to meet a zoning deadline. Apart from the fact that there was no actual vacancy percentage available to the Council for luxury apartments, there was no need for any vacancy ratios, since there was documented data as to the actual number of vacancies as well as the financial position of the tenants, which supplied the proof that a competitive market most certainly existed (People, Housing and Rent Control in New York City). The inability of the City Council to calculate a precise mathematical vacancy index as to the luxury apartment class cannot be deemed fatal (Bucho Holding Co. v. Temporary State Housing Comm., 11 N Y 2d 11, supra).
There is no merit to the plaintiffs’ assumption that decontrol must be based constitutionally on a 5% vacancy standard or to plaintiffs’ contention that the City Council has no power to constitutionally decontrol under the State enabling act. The validity of the delegation of power to the City Council under *896 the State enabling act to determine the need for continuing rent control and the recognition of a net rental vacancy of 1.79% has been judicially approved (Amsterdam-Manhattan, Inc. v. City Rent and Rehabilitation Administration, supra). On all of the foregoing, motion for summary judgment for the defendant is granted.