OPINION OF THE COURT
John A. Milano, J.
In these holdover proceedings, wherein the petitioner landlord seeks possession of the respondent tenants’ apartments for breaching a provision of the lease prohibiting the harboring of animals, to wit, a dog, in the said premises, this court is called upon to decide whether council introductory No. 569-B (waiver of no pet covenants) is unconstitutional because its retroactive application would violate the sanctions and restrictions of the Urstadt Law (L 1971, ch 372) as well as due process and the impairment of obligation of contracts.
*1017 PROCEEDINGS
The petitioner landlord, pursuant to subdivision A of section 53 of the Code of the Rent Stabilization Association of New York City, Inc. (Rent Stabilization Code), served a 10-day notice to cure alleging the subject premises was in violation of the lease provisions prohibiting the harboring of a dog or dogs in violation of article 9 and rule 13 of the rules and regulations of said lease. The respondent tenants in their answer admit to presently occupying the subject premises and to keeping a pet dog. They further state, as an affirmative defense, that the petitioner landlord has waived its right to commence these proceedings for the reason that it failed to commence, within the first three months of tenants’ possession of their dogs, an action or proceeding to enforce any language in the lease with respect to pets. It is agreed and conceded by the attorneys for the parties herein that the tenants have openly possessed their pet dogs for more than three months in the subject premises.
THE LOCAL LAW AND LEGISLATIVE DECLARATION
On October 26,1983, the Mayor of New York City signed and approved introductory No. 569-B, effective immediately, amending chapter 26 (tit D, subtit II, art 10) of the Administrative Code of the City of New York by adding a new section, D26-10.10, which states as follows:
“Rights and responsibilities of owners and tenants in relation to pets. — a. Legislative Declaration. The Council hereby finds that the enforcement of covenants contained in multiple dwelling leases which prohibit the harboring of household pets has led to widespread abuses by building owners or their agents, who knowing that a tenant has a pet for an extended period of time, seek to evict the tenant and/or his pet often for reasons unrelated to the creation of a nuisance. Because household pets are kept for reasons of safety and companionship and under the existence of a continuing housing emergency it is necessary to protect pet owners from retaliatory eviction and to safeguard the health, safety and welfare of tenants who harbor pets under the circumstances provided herein, it is hereby found that the enactment of the provisions of this section is *1018 necessary to prevent potential hardships and dislocation of tenants within this city.
“b. Where a tenant in a multiple dwelling openly and notoriously for a period of three months or more following taking possession of a unit, harbors or has harbored a household pet or pets, the harboring of which is not prohibited by the multiple dwelling law, the housing maintenance or the health codes of the city of New York or any other applicable law, and the owner or , his agent has knowledge of this fact, and such owner fails within this three month period to commence a summary proceeding or action to enforce a lease provision prohibiting the keeping of such household pets, such lease provision shall be deemed waived.
“c. It shall be unlawful for an owner or his agent, by express terms or otherwise, to restrict a tenant’s rights as provided in this section. Any such restriction shall be unenforceable and deemed void as against public policy.
“d. The waiver provision of this section shall not apply when the harboring of a household pet causes damage to the subject premise creates a nuisance or interferes substantially with the health, safety or welfare of other tenants or occupants of the same or adjacent building or structure.
“e. The New York city housing authority shall be exempt from the provisions of this section.
“Section 2. This local law shall take effect immediately and shall apply to existing and future leases and renewals.”
CONTENTION OF PETITIONER LANDLORD
The landlord submits that any retroactive application of said bill is unconstitutional and cites Gilbert v Ackerman (159 NY 118), wherein the Court of Appeals stated that the only restriction upon the Legislature in the enactment of Statutes of Limitation is that a reasonable time be allowed for suits upon causes of action theretofore existing. Further, that no paramount interest of the People is at stake nor is there any question involving public health, welfare or morals, for prior to the time the new statute was adopted, the law sanctioned agreements like the kind in *1019 question. Petitioner also submits that it has a vested right pursuant to a written lease and that such vested rights cannot be impaired retroactively without denying due process of law.
ARGUMENT OF RESPONDENT TENANTS
Respondents urge that they are protected by the law in that (1) the enactment was intended by the city council to be retroactive with respect to pets kept openly for three months before the landlord commences suit, irrespective of when the law was enacted; (2) the enactment is a constitutional and valid exercise of the city’s emergency and police powers; (3) the enactment is a permissible exercise of the city’s power to act, with respect to the State Legislature.
RETROACTIVITY
The city council intended the newly enacted local law introductory No. 569-B to apply retroactively, to existing leases and to tenants having already openly possessed their household pets for three months prior to commencement of suit, without regard to when the new legislation was signed. The language in the law with respect to retroactivity is express and unambiguous and is set forth below in pertinent part: “Section 1. (b) Where a tenant openly and notoriously for a period of three months or more following taking possession of a unit, harbors or has harbored a household pet * * * and [the] owner fails within this three month period to commence a summary proceeding or action to enforce [the] lease provision * * * such lease provision shall be deemed waived” and “Section 2. This local law shall take effect immediately and shall apply to existing and future leases and renewals.” (Emphasis supplied.)
The language is clear: three months of harboring after the taking possession of a unit, effective immediately with application to existing leases. There is simply no language anywhere in the bill about a three months’ period in which landlords may act, once prior possession is established, subsequent to the law’s enactment. Had the city council intended such a result, it would have been a simple matter to implement. The law could have been made effective three months after enactment. Further, a review of preenactment legislative material makes it abundantly clear *1020 that the council intended the law to be retroactive and to protect tenants who had openly kept their pets for three months after taking possession of their apartments, without the granting of any “grace” period. The Housing and Building Committee’s report to the full council, in favor of the bill, set forth the following: “Importantly the amended version of the Introduction 569 makes the provisions of the bill applicable to those leases which were executed before the bill is enacted into law as well as to future leases and renewals. Therefore tenants who currently keep household pets * * * and have done so for the period of time * * * specified herein, will be afforded the protection of the waiver.”
And legislative intent with respect to the three months’ provision is very clearly addressed in the minutes of the committee just prior to its unanimous vote for the bill: “Chairman [Thomas] Manton: * * * [W]e want to make it clear that the legislative intent of this bill is that when it becomes effective that if someone already has had a pet for three months, then that time is frozen and will not be a three month hiatus during which owners will attempt eviction. It will become a fait accompli on the day this bill is signed into law. That intent is also contained in our legislative report [Committee report].” And in an interview in the New York Law Journal on November 2,1983, Councilman Manton emphasized the intent of the council was never to permit a three-month “grace” period for fear of the mass evictions which would ensue once the bill was signed. He stated: “Without the inclusion of language making the statute applicable to ‘existing’ leases we would have created a three month hunting season on tenants with pets and that was certainly not our intent.” Clearly then, the intent of the city council was to protect tenants such as those at bar whose landlord has admitted their open possession more than three months prior to the commencement of a summary 'proceeding or action to enforce the lease.
THE URSTADT LAW
In addition to the existence of the general home rule provisions in the New York State Constitution (art IX, § 2) the city council has been given specific power to act in the *1021 area of rent regulations and evictions by the State. (L 1971, ch 372 [commonly referred to as the Urstadt Law].) The first paragraph reads as follows in pertinent part: “Each city having a population of one million or more, acting through its local legislative body, may adopt and amend local laws or ordinances in respect of the * * * regulation and control of residential rents, including but not limited to * * * [providing] for the establishment and adjustment of * * * regulation of evictions, and the enforcement of such local laws * * * [and] ordinances. The validity of any such local laws or ordinances, and the rules or regulations promulgated in accordance therewith, shall not be affected by and need not be consistent with the state * * * [statutes]”. (L 1971, ch 372, § 1.)
Clearly, so far as stated the council was within its power to enact a local law addressing the power of a landlord to procure an eviction. But the third paragraph, however, of section 1 of chapter 372 of the Laws of 1971 contains a so-called Urstadt restriction, herein set forth in pertinent part: “No housing accommodations presently subject to regulation and control pursuant to local laws * * * [and] ordinances adopted or amended under authority of this subdivision shall hereafter be by local law or ordinance subjected to more stringent or restrictive provisions of regulation and control than those presently in effect.”
A reading of the Governor’s memorandum at the time of the enactment of the Urstadt provisions shows that, the intent of chapter 372 was to prevent more stringent economic restrictions from being imposed on owners and not just any restrictions. At the time chapter 372 of the Laws of 1971 was enacted, vacancy decontrol on a State-wide basis was also to be phased in. (L 1971, ch 371.) This action, as well as the Urstadt Law, was seen as a necessity in helping “recreate the investor confidence that is a prerequisite to private sector investment of new funds in housing construction and maintenance.” (See Governor’s Memorandum, McKinney’s Session Laws of NY, 1971, vol 2, p 2609.) And in a memorandum of the State Executive Department concerning support for the bill
“Since the enactment of the City Rent Stabilization Law, virtually all new private housing construction in the City *1022 has ceased. A major cause of this is the fear on the part of investors and builders that new housing may in the future be made subject to rent regulation and control, as occurred in 1969 with respect to post-1947 housing. By removing the City’s power to take such action in the future, this bill will greatly encourage the construction of new housing in the City by the private sector, the need for which is more acute now than at any time in the city’s history.
“The bill would in no way adversely affect the rights of any tenant now under rent control or stabilization, nor foreclose the power of the State at some future date to impose controls over rents should economic conditions justify it.” (Memorandum of State Executive Dept, McKinney’s Session Laws of NY, 1971, p 2401.)
And see memorandum (NY Legis Ann, 1971, p 562) where Governor Rockefeller commented upon the need to correct for too restrictive rent policies, stating in part: “Rent control in New York City has played havoc with natural market forces, which normally would have matched housing supply to housing demand. The rent control law in many respects has worked to the detriment of the very groups it was designed to help.” It thus appears that preventing more stringent economic and rent-control restrictions was the objective and intent of chapter 372 and that the retroactive application of the “waiver of no pet covenant law” does not violate Urstadt either in spirit or in letter. Certainly the legislation at bar cannot be seen to provide a monetary disincentive to rehabilitate, maintain and invest in massive new construction. Particularly with respect to buildings yet to be constructed, owners will always have the right to invoke the no pet clause during the first three months of possession. Indeed, the only enactments invalidated by the Urstadt restrictions involve those restricting rents. (See Mayer v City Rent Agency, 46 NY2d 139 [Labor Cost Repeal Law invalidated]; Matter of 241 East 22nd, St. Corp. v City Rent Agency, 33 NY2d 134 [law precluding certain hardship rent adjustments invalidated]; 210 East 68th St. Corp. v City Rent Agency, 43 AD2d 687 [with respect to the minimum base rent].) And in the only “Urstadt” case found which was unrelated to rent restrictions, the court held Urstadt not applicable. *1023 Considering a council enactment for the public welfare requiring window bars, it was held that: “[Statutes governing rent-control regulations] * * * were not intended to restrict a municipality in adopting public safety legislation or regulations for purposes other than rent regulation even though more stringent”. (Bryant Westchester Realty Corp. v Board of Health, 91 Misc 2d 56, 59; emphasis added.)
Analyzing the intent of the Urstadt Law from the perspective of rent-control reforms which were enacted at the same time, it is difficult to see how introductory No. 569-B would offend Urstadt. The local law imposes no new economic restrictions on landlords, and, in fact, merely codifies current case law which has been applying the equitable theory of laches in situations where owners have, for extended periods of time, acquiesced to the breach of a no pet clause. No landlord has the right to employ unscrupulous methods in a retaliatory eviction scheme to further his own economic advantage. And no tenant should have a “sword of Damocles” hanging over his or her head and preventing them from asserting their rights for fear of retaliation. Preventing these tactics is the very underpinning of the “no pet law” which in effect is an extension of current laws which classify particular modes of conduct as constituting harassment. (See Real Property Law, § 223-b [retaliatory eviction statute].)
PRIVATE CONTRACTS DUE PROCESS AND THE POLICE POWER
It is settled law that a Legislature has the power to impair contracts, if such an impairment results from a law enacted in legitimate exercise of the police power. And legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption, but, as is customary in reviewing economic and social regulation, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure. (East N.Y. Bank v Hahn, 326 US 230.) Courts frequently have reiterated that principle. In Reed v Knollwood Park Cemetery (441 F Supp 1144) the court held that an impairing statute was constitutional because the statute served a legitimate public purpose. Setting forth *1024 language from United States Trust Co. v New Jersey (431 US 1) the Knollwood court (supra) wrote that: “the states * * * [would] possess broad power to adopt general regulatory measures for the public welfare without being hindered by the impairment, or even [the] destruction, of private contracts.” (441 F Supp, at p 1149; emphasis added.)
Furthermore, such impairment need not be the result of emergency legislation, but can be a “reasonable and necessary means to correct the reported abuses” (p 1150; emphasis added). New York’s Court of Appeals has held as well that the constitutional provision against the impairment of contracts is not absolute, if the disputed legislation is for the general good of the public. The test is whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end. (People’s Sav. Bank v County Dollar Corp., 35 NY2d 836, affg 43 AD2d 327.) And on the question not whether the council has the right to reasonably and legitimately impair, but whether it has the right to withhold a grace period, we need only look to related legislation. Current rent-control and rent-stabilization provisions were enacted as legitimate applications of the police and emergency power and they routinely froze rents as of an earlier date than that on which the legislation became effective. Section 21 of the New York City Rent and Eviction Regulations on maximum rents for housing accommodations under the Rent Control Law became effective on March 1, 1963, but provided that “the maximum rents for housing accommodations shall be the maximum rents in effect on April 30, 1962”. (New York City Rent and Eviction Regulations, § 21, subd a.) Similarly, section 130 of the regulations applies to housing covered by the Rent Stabilization Law of 1969 (Administrative Code, § YY51-1.0 et seq.) and sets maximum rent as that in effect on May 31, 1968. The effective date of section 130 is August 15, 1969. (Administrative Code, § 131.) Most recently the newly enacted amendment to section 235-f of the Real Property Law, unlawful restrictions in occupancy (L 1983, ch 403), with respect to roommates, was justified as being required by the continuing housing emergency, by abuses of landlords and by court decisions hampered by a lack of legislative *1025 leadership. Subdivision 2 of section 235-f provides: “2. It shall be unlawful for a landlord to restrict occupancy of residential premises, by express lease terms or otherwise, to a tenant or tenants or to such tenants and immediate family. Any such restriction in a lease or rental agreement entered into or renewed before or after the effective date of this section shall be unenforceable as against public policy ” (Emphasis added.) It is interesting to note that the roommate law does not provide for a grace period for prospective leases as the “no pet” housing bill does.
LEGISLATIVE FINDINGS
That pet owners are the victims of the same housing emergency as roommates is abundantly clear. With respect to abuses, the city council has held hearings and made careful findings over a four-year period of the flagrant abuses by landlords enforcing the no pet clause for ulterior motives and not for a rational objective such as nuisance or unsanitary conditions. The legislative declaration contained within the bill itself states in pertinent part with respect to abuses: “The Council hereby finds that the enforcement of covenants contained in * * * leases which prohibit the harboring of household pets has led to widespread abuses by building owners or their agents, who knowing that a tenant has a pet for an extended period of time, seek to evict the tenant and/or his pet often for reasons unrelated to the creation of a nuisance.”
And with respect to the housing emergency: “Because household pets are kept for reasons of safety and companionship, under the existence of a continuing housing emergency it is necessary to protect pet owners from retaliatory eviction and to safeguard the health and safety of tenants who harbor pets under the circumstances provided herein, it is hereby found that the enactment of the provisions of this section is necessary to prevent potential hardship and dislocation of tenants." (Emphasis added.)
And see the references to the abuses and/or to the housing emergency in the excerpts from the Housing and Buildings Committee, September 22, 1983, and from the minutes of the stated meeting wherein on October 13,1983, the bill was passed by the city council, 34-0. “We have a landmark bill that provides for the elimination of retalia *1026 tory evictions or for evictions designed for purposes of enhancing profits or conversions to co-ops * * * where it is being used selectively and discriminatively * * * by landlords. We are not eliminating the landlord’s right to enforce a contract that says no pets but at least the landlord will have to be up front through its agent, superintendent, in saying we are not a pet building, we don’t permit pets. If you want a pet, we will not welcome you into our building because we will enforce it. If they don’t enforce it within the first three months or they wink at it, then the pet is there and cannot be removed. So all in all, it is a fair bill and it provides protection for the many thousands of people that already have pets and have had pets for months and years who are lately in jeopardy of being evicted by reason of having these pets and caring for and loving these pets * * * What it does say is that you cannot use that pet clause for a retaliatory type of eviction. The testimony that we had at various hearings indicates that many of the landlords, in effect, waive these clauses over long periods of time, years, but as soon as the tenants joined a tenant association or spoke up for tenants’ rights, they found that they were being evicted because they violated the pet clause. It does not protect nuisances, where a pet is a nuisance or the pet bothers other tenants or persons or damages property, that pet will not be protected by this bill and the eviction could ensue if that condition is not corrected.” Clearly- the council, from facts adduced at the legislative hearings, was satisfied that a continuing housing emergency existed sufficient to evoke its police power despite any impairment of contract rights. And it found that the no pet clauses had been sufficiently abused by landlords to warrant this invocation of the police power.
CONSTITUTIONALITY
Where, as hereinabove demonstrated, a rational basis has been established for the enactment of local law introductory No. 569-B by documented and unquestioned historical evidence, this court will not substitute its judgment for the legislative judgment of the council. Presumption is always in favor of constitutionality and the law presumes that the “Legislature has investigated for and found facts *1027 necessary to support the legislation” (I.L.F.Y. Co. v Temporary State Housing Rent Comm., 10 NY2d 263, 269). Unless the action taken by the Legislature is clearly arbitrary, unreasonable or capricious, it must be upheld by, the courts. It cannot be denied because not only was the council acting upon the pooled general knowledge of its members but in the conduct of its legislative hearings, the resulting law showed the empiric process of legislation at its fairest. (See Gauthier v Gabel, 44 Misc 2d 887; cf. Colosi v Starr, 85 Misc 2d 797.) And it is the burden of the party challenging a legislative enactment to prove beyond a reasonable doubt that the enactment is unconstitutional. (Council for Owner Occupied Housing v Koch, Supreme Ct, NY County, April 25,1983, index No. 28394/82, citing Matter of Catapano Co. v New York City Fin. Admin, 40 NY2d 1074, app dsmd 431 US 910; Seagram & Sons v Hostetter, 45 Misc 2d 956, affd 23 AD2d 933, affd 16 NY2d 47, affd 384 US 35, reh den 384 US 967; Paterson v University of State of N. Y., 14 NY2d 432; McKinney’s Cons Laws of NY, Book 1, Statutes, § 150.) And legislative enactments carry strong presumption of constitutionality (Council for Owner Occupied Housing v Koch, supra, citing Matter of Spielvogel v Ford, 1 NY2d 558, app dsmd 352 US 957, reh den 352 US 1019; Defiance Milk Prods. Co. v Du Mond, 309 NY 537; Matter of Ahern v South Buffalo Ry. Co., 303 NY 545, affd 344 US 367; McKinney’s Cons Laws of NY, Book 1, Statutes, § 150.)
It is apparently clear to this court that the provisions for immediate effect and the retroactive application of the instant enactment are completely consistent with the city council’s power to act in an emergency, particularly after a finding of both emergency and abuse. With respect to Statutes of Limitation, the new enactment under the police power cannot be viewed as the courts have viewed the enactment of new Statutes of Limitation. Concededly the latter are required to provide time for existing causes to be brought. The difference is that this “no pet” housing law was not meant to function as a Statute of Limitations which is designed primarily to limit stale claims, to protect a defendant against the burden of finding eyewitnesses and retrieving old evidence. (Orange & Rockland Utilities *1028 v Philwold Estates, 52 NY2d 253.) Indeed the purpose is to differentiate between those owners who have failed to act in good faith within a reasonable time to enforce the “no pet covenant” and thereby waive their rights by statutory enactment, the objective of which is to prevent and curb documented abuses and those owners who must in the future commence their proceedings for enforcement within three months of the open harboring of a pet as a demonstrated showing of good faith or else also lose said right by waiver imposed by the law. The cutting off of stale rights in these circumstances is to give obvious effect to the waiver and not to compel scores of owners to go to court. In the opinion of this court, this is the heart and crux (said differentiation) of the bill and without it, the bill would fail its intended purposes which are fair and salutary. In the 1899 matter of Gilbert v Ackerman (159 NY 118, supra) cited by petitioner landlord which appears to be a leading case on the issue of newly enacted Statutes of Limitation, there is no suggestion whatsoever of an emergency situation or of abuse. This court suggests that “a lot of water has flowed under the bridge” since that 1899 decision. Further, the court in Gilbert talks of substantial property rights. Can it truly be said that absent nuisance or sanitary problems which the landlord is entitled to bring into court to seek redress, is the technical “no pet clause” in leases a “substantial property right” which would offend due process and impairment of obligation of contracts? This court emphatically thinks not. In addition this court takes judicial notice of the fact that there are about 950,000 rent-stabilized tenants in the City of New York and their rights and obligations are governed by renewal leases, the language of which cannot be varied or changed (Rent Stabilization Code, § 60). This means that a “no pet clause” in a lease as far back as 1969 carries forward with no right on the part of the tenant to renegotiate based on fact that said tenant has harbored a pet for years with full knowledge on the part of the owner. (See Belmar Realty Corp. v Brown, NYLJ, July 25, 1974, p 11, col 2.)
CONCLUSION
That by reason of the foregoing, this court concludes that local law (council introductory No. 569-B) passes constitu *1029 tional muster and that there exists a rational basis and justification for the enacted legislation and that said local law may be applied retroactively without violating the sanctions and restrictions of the Urstadt Law or due process. The court further holds that on balance the action of the city council in passing this local law to curb and stop documented substantial abuses upon tenants far outweighs a “no pet clause” provision in a lease which this court deems not to be a substantial property right to the extent that the landlord would be severely prejudiced in view of the safeguards to landlords contained in the said bill. In regard to the two summary proceedings at bar, the court rules that there has been an effective waiver of the landlord petitioner’s no pet covenants and, therefore, the petition in index No. 48156 and the petition in index No. 48157 are dismissed with prejudice.