OPINION OF THE COURT
Leonard N. Cohen, J.
This protracted proceeding is a classic example of municipal urban housing and planning failure — an illusion once projected as progress for the subject building and neighboring blocks but allowed to crumble into the disillusion of decay, inaction, displacement of the poor, and scandal.
The city contends it need not do anything to correct uninhabitable conditions and code violations of occupied, privately owned and abandoned multiple dwellings. This is sharply disputed by the four intervening tenants of a 20-unit multiple dwelling at 208 West 84th Street.
The city’s contention highlights a bankrupt housing preservation policy which often renders the Housing Court helpless in discharging judicial responsibilities. The tenant’s right to habitable housing under section 235-b of the Real Property Law is undermined not only by the callousness of the owner but the city. Moreover, the integrity of the Housing Court is adversely affected in the dispensation of justice.
This contempt proceeding was instituted by the city’s Housing Development Administration, since, ironically, renamed Housing Preservation and Development Agency (HPD) against the owner, who had abandoned this occupied multiple dwelling because of the owner’s noncompliance with court orders to remedy hazardous violations. A substantial fine was imposed upon the owner in default of a contempt order. (Housing and Dev. Admin, of City of N. Y. v Realty Co., NYLJ July 14, 1976, p 9, col 1.) Several tenants were granted leave to intervene and unpaid rents were abated from December 1, 1975 through October 31, 1976 without opposition by HPD in view of conceded uninhabitable conditions. Held in abeyance was a branch of tenants’ motion for a continuation of rent abatement until the premises were made habitable as well as the appointment of HPD, at the court’s recommendation, as administrator under section 778 of the Real Property Actions and Proceedings Law and subdivision (c) of section 110 of the New York City Civil Court Act. The HPD conditioned its *45 consent to appointment as administrator on tenant co-operation of rent payments from January, 1977 and thereafter, and so notified tenants by mail. The tenants have not agreed to this condition in the absence of any plan, proposal or commitment by the city toward application of rent or public funds for remedying the violations and making the premises habitable. The tenants having no other choice, are operating the building without pay although minimal emergency hot water, heat and electricity services have been provided during 1977 by HPD without recoupment.
Other than initiating and obtaining redress by an unenforceable fine against the contemptuous abandoning owner, providing minimal emergency services and acceptance of a conditional administrator appointment, the HPD denies any further statutory duty to do anything to ensure code compliance and decent living conditions.
The tenants urge that a mandatory duty is imposed upon the city, through HPD, to exercise one or more of the various statutory remedies available to enforce code compliance and to maintain habitable housing in occupied but owner-abandoned multiple dwellings. In effect, the tenants contend that habitable housing is a tenant’s right and must be provided by the owner or the city.
The HPD takes an opposite position and views its powers of implementation of code enforcement and choice of remedies as discretionary and disclaims therefore, any duty to maintain uninhabitable privately owned abandoned buildings.
In support of the tenant’s position, legislative findings of public policy state “that the establishment and maintenance of proper housing standards * * * are essential to the public welfare * * * and their necessity in the public interest is hereby declared as a matter of legislative determination.” (Multiple Dwelling Law, § 2) “[T]he enforcement of minimum standards of health and safety, fire protection, light and ventilation, cleanliness, repair and maintenance, and occupancy in dwellings is necessary to protect the people of the city against the consequence of urban blight. The sound enforcement of minimum housing standards is essential * * * 3. to bring about the basic decencies and minimal standards of healthful living in already deteriorated dwellings, which, although no longer salvageable must serve as habitations until they can be replaced.” (Administrative Code of City of N. Y., § D26-1.03.)
*46 The Code further provides that its enactment imposes "duties and responsibilities for the preservation of the dwellings * * * upon owners and tenants, as well as on the municipality, itself, enforceable by a broad range of legal, equitable and administrative powers” (Administrative Code, § D26-1.03).
Enforcement of section 2 of the Multiple Dwelling Law is provided under subdivision 1 of section 303 of the Multiple Dwelling Law and states "[e]xcept as herein otherwise provided, the provisions * * * shall be enforced by the department charged with the enforcement of laws, ordinances and regulations in relation to multiple dwellings.”
The HPD, as the city department charged with housing code enforcement, declined to exercise remedies and powers to implement these broad legislative code enforcement purposes and intentions except for the conditional article 7-A of the Real Property Actions and Proceedings Law appointment.
An article 19-A of the Real Property Actions and Proceedings Law remedy permitting the city to take title to abandoned dwellings was rejected on the basis of a finding of lack of tenant or "qualified community interest” in acquiring the building without which the city would not undertake this proceeding. No facts were submitted for the basis upon which this conclusion of community disinterest was reached nor what community groups were approached, if any. This remedy, according to HPD envisions itself solely as a conduit to pass title to such community groups. Moreover, HPD found, not only this building, but the entire block deteriorated to such an extent, that it negated a housing investment or commitment of any kind.
Nor did HPD see fit to issue a vacate order pursuant to section D26-56.01 of the Administrative Code.
The HPD declined to foreclose on the building for tax arrears as it contended the building would then only later be sold for public auction.
The section 309 of the Multiple Dwelling Law receivership remedy available to HPD to manage and operate a building, was declined as "inappropriate”. The receivership authority contained in section D26-55.01 of the Administrative Code of the City of New York likewise was rejected.
The court’s recommendation to have HPD appointed an article 7-A administrator under powers conferred by subdivision (c) of section 110 of the New York City Civil Court Act *47 and section 778 of the Real Property Actions and Proceedings Law was the sole remedy acceptable. However it was conditioned upon the tenants’ "co-operation” and agreement prospectively to pay rent directly to it, despite acknowledgment of uninhabitable conditions; the tenants’ right to prior rent abatement and the inadequacy of such payments to cover costs of any repairs for code compliance. In the absence of any HPD plan, proposal or monetary commitment to remove violations, either from rental or public funds, no tenant agreed. To this date, no expenditure of city funds, other than emergency repairs has been exercised or proposed by HPD or intended by it.
Code enforcement is directed solely at owners, HPD contends, and the exercise and choice of remedies are within its sole discretion. Nowhere does there exist a statute, argues HPD, which makes it responsible for maintaining abandoned but occupied private multiple dwellings.
For example, subdivision 5 of section 309 of the Multiple Dwelling Law states: "[i]f the department shall desire that a receiver be appointed” (emphasis mine). Likewise section 1970 of the Real Property Actions and Proceedings Law provides: "The department * * * may institute a proceeding * * * for a judgment vesting in the city title to a multiple dwelling * * * which has been abandoned by the owner.”
Similarly, section D26-55.01 of the Administrative Code confers permissive power to apply for a receivership appointment to repair and correct violations "[wjhenever the department certifies that any condition * * * constitues a serious fire hazard or * * * threat to life, health or safety”. Vacate orders under section D26-56.01 of the Administrative Code are also discretionary.
Finally, under section D26-53.01 of the Administrative Code and section 306 of the Multiple Dwelling Law, the department may institute any appropriate action or proceeding to restrain, correct or abate a code violation or nuisance.
The city’s position undermines a tenant’s right to habitable housing under section 235-b of the Real Property Law and city code enforcement laws. Not only are occupants of such buildings as the one herein denied habitability but the Housing Court is placed in an obviously helpless position by the owner and the city to carry out the courts’ powers for effective code enforcement as intended by the Legislature under section 110 of the New York City Civil Court Act.
*48 It does not follow that the city in its sovereign representative capacity is relieved of all responsibility and need do nothing to compel code enforcement to protect the health, safety and welfare of the people. If this were the case, then the entire statutory code enforcement administration would collapse and with it the city.
The city power to correct uninhabitable conditions, as viewed as discretionary by HPD, conflicts with the express city and State public policy, protective of the health, safety and well-being of tenants.
It is incumbent upon the city, however, in exercising discretion to demonstrate good faith, diligent and reasonable efforts to carry out the overriding housing public policy. HPD ought not to act arbitrarily and unreasonably, and the burden is placed on HPD to justify its discretionary conduct to the satisfaction of the court.
This court finds under all the circumstances that HPD has not satisfactorily sustained its burden.
A variety of flexible procedures and enforcement powers are available to implement housing public policy. Although legislation does not mandate the city to provide habitable housing under all circumstances, the HPD, here, has itself initiated this contempt proceeding against the owner thereby recognizing uninhabitable conditions and violations of law and public policy.
To condition appointment on rental payments to HPD, without any commitment to commence repairs, and acknowledgement that such payments would be insufficient to remove code violations, hardly constitutes a good faith, reasonable effort by HPD of this public policy implementation. The tenants in effect have been constructively evicted as no management or operational services, other than of an emergency nature, are provided; no repairs have been made and serious hazardous violations of record remain uncorrected. Were a private owner to take the same position as HPD takes under these circumstances neither HPD nor the court would find this satisfactory.
Rental deposit or payment might be directed but invariably dependent upon the owner remedying the uninhabitable conditions it caused. Put another way, the city, by demanding rent and vetoing a monetary commitment of repair because of the extent of deterioration, takes the same position as private owners do as a prelude to abandonment.
*49 The city’s claim of blamelessness in creating the uninhabitable condition to justify its position, is of dubious merit. For the city, by ineffectual and untimely code enforcement action, permitted conditions to worsen.
The city, in effect, contends it need not carry out the housing preservation public policy which it imposes on private owners.
Generally, legislative reliance is placed on the traditional role of a judicial forum (in this city the Housing Court) to resolve nonpayment summary eviction proceedings to obtain private owner repairs or code enforcement. Withholding or abatement of rent, deposit of rent or avoidance of civil penalties and injunctive relief, until violations are cured or repairs made, are used to compel habitable housing and rehabilitation. This process functions on a case by case building by building, daily basis, but in the vacuum of any comprehensive housing strategy and flexible funding program by Federal, State and city government. It is clear that deposit of rent, either with HPD or the court in this proceeding, would not produce code enforcement or habitable housing but imposes a punishment or penalty on tenants who are innocent victims of absentee owner contempt and city indifference.
The crux of the impasse involved here rests on HPD’s veto power over any Housing Court proposal for enforcement of housing standards under subdivision (c) of section 110 of the New York City Civil Court Act, which provides: "in the event any such proposed remedy * * * entails the expenditure of monies appropriated by the city, other than for the utilization and deployment of personnel and services incidental thereto, the court * * * shall not employ such proposed remedy * * * if such department shall advise the court in writing * * * of the reasons such order should not be issued”. Moreover, under section 778 of the Real Property Actions and Proceedings Law, a HPD administrator appointment is subject to its consent in writing.
If this power is exercised negatively by HPD than uninhabitable conditions, urban blight and abandonment may be perpetuated; the city and State public policy may be thwarted; this court of exclusive housing summary jurisdiction may be paralyzed; the credibility of public officials and government is eroded; and more significantly tenants are doomed to live in uninhabitable housing.
The extent of deterioration of the building and block, ac *50 cording to HPD, negates any action for improvement admitting, thereby, an inability to enforce the law and implement public policy.
A flexible range of funding may be essential to obtain affirmative actions but a habitable housing preservation strategy is also essential in order for this court to achieve effective code enforcement and rehabilitation.
The city shares responsibility for the recent acceleration of deterioration in these premises and immediate vicinity. The court takes judicial notice of abortive, scandulous and discarded urban land use planning and capital budget proposals in the 1950’s and 1960’s involving this building and two or three blocks east of Broadway. As a result an urban pocket of uncertainty and abandonment prevails in which the intervening tenants herein have had to endure uninhabitable housing.
The court also takes judicial notice of the varied racial, ethnic and economic mix in housing and commercial retail activities and the extensive stabilizing public and private facilities available in the surrounding neighborhood. Potentialities for housing preservation and development, protective of remaining tenants, have not been reasonably explored. The court is aware of massive city-wide housing needs and of pockets of poverty and housing decay within stabilized neighborhoods. Both must be addressed simultaneously. It is in this perspective the court approaches the instant proceeding.
The Legislature has conferred upon this court broad and flexible powers in seeking a feasible and constructive remedy and program for code enforcement under section 110 of the New York City Civil Court Act, regardless of whether or not the occupied building is owner abandoned.
It is undisputed by HPD that rent payments from the few tenants who have not vacated despite intolerable conditions are incapable of providing sufficient funds for repairs; nor does it intend to expend city sums for code enforcement; nor has the city proposed any program for rehabilitation; uninhabitable conditions are undisputed; HPD negative findings and conclusions lack the basis upon which it relies; the extent, if any, of community consultation is likewise lacking; the tenants here have been constructively evicted; the city itself has in part brought about deterioration because of its planning failures; and the HPD has nevertheless accepted in principle appointment as administrator.
Under all these circumstances, the disposition of this contin *51 ued proceeding is approached by the court with a constructive view toward promoting the public interest. Accordingly, the following are the interim directions of the court:
1. The HPD is appointed a temporary administrator of the subject multiple dwelling under subdivision (c) of section 110 of the New York City Civil Court Act. The administrator shall arrange for necessary janitorial services in co-operation with the few tenants remaining; continue emergency services for heat, hot water and utilities; maintain minimum health, fire safety and other life sustaining services; ascertain cost estimates for repairs and maintenance; and to consider having the city take title and possible resale to a community group and rental to Social Services or the City Housing Authority or other variations for preservation as low income housing; evaluate future full or partial recoupment depending upon the plan or proposal; and arrange for health and fire reinspections of the building as promptly as possible.
2. HPD is directed to co-ordinate with appropriate governmental agencies a review of existing conditions, property ownership, occupancy and code violations of the immediate block; and to prepare a joint interagency feasible redevelopment and preservation plan for the subject premises and immediate block and vicinity, to include necessary public facilities, code enforcement and subsidized new or rehabilitated housing for low and moderate income tenants with cost estimates and funding sources. The review shall be in consultation with tenants affected, Community Board 7 and the institutional and community groups within the general area. The HPD shall initiate and commence compliance with this direction no later than 20 days after appropriate notice of a copy of entry of this order. These directions are consistent with subdivision (c) of section 110 of the New York City Civil Court Act as no expenditure of city funds is entailed other than for the utilization and deployment of personnel and services incidental thereto.
3. The court, sua sponte, adds Community Board 7 as a party under subdivision (d) of section 110 of the New York City Civil Court Act for the purpose of advice, consultation and recommendations to HPD, the tenants and the court in order to effectuate proper housing maintenance standards and to promote the public interest pursuant to the terms of the order herein.
4. HPD, as temporary administrator, shall submit to the *52 court and serve on the intervenor tenants and Community-Board 7 a report in accordance with this interim order on or before May 29, 1978. This court continues jurisdiction of the proceeding. A hearing date shall be fixed by the court upon submission of the report.
5. HPD is directed to arrange for a visit by the court, the HPD and Community Board 7 representatives to the subject building and the vicinity prior to the submission and service of the HPD report.
6. All rental payments by the intervening tenants are abated from the date of the prior order of this court to date and shall continue abated until the HPD serves and files the report in accordance with the foregoing at which time the court will consider whether or not abatement of rents shall continue.
The tenant interveners shall promptly serve a copy of notice of entry of this interim order on HPD and Community Board
7. This interim disposition is without prejudice to the rights of HPD, Community Board 7, and the tenant intervenors to apply for alternative remedies and programs which each may deem advisable to promote the public interest.