OPINION OF THE COURT
Diane A. Lebedeff, J.
This special proceeding seeks the appointment of an administrator for a multiple dwelling pursuant to RPAPL article 7-A. This case has special interest because it raises issues relating to the recent amendments to the article and to the availability of a court’s discretion in the determination of whether a judgment should be granted under article 7-A.
FACTUAL FINDINGS
The property involved is located at 167 Bleecker Street in the Greenwich Village section of Manhattan. The building itself is an old law tenement with 16 small, poorly designed, and poorly maintained apartments. A bar is located on the street level.
*847 The owner is subject to a court order directing the correction of several of the conditions complained of in this proceeding. It was issued several months before the commencement of this proceeding pursuant to section D2651.01 (subd [h]) et seq. of the Administrative Code of the City of New York. The petitioners have expressed the view that they would prefer correction of the conditions by an administrator to a determination that the elderly woman who is the principal officer of the corporate owner is in contempt of court for her failure to comply with the order.
Seventy-six violations of record were recorded against the property by the municipal agency charged with housing code enforcement, with only three violations having been corrected in the four months between the order and the trial. The violations are primarily of the “hazardous” class, with a few in the “immediately hazardous” class.
The court inspected the building as a part of the trial. Some easily remediable conditions, i.e., cleaning of rubbish and fecal matter in the public areas of the building, were corrected. The conditions dependent upon weather, such as a cascading water leak in the hallway which was present during and long after any rainstorm, were not apparent during the inspection, which took place during a week of exceptionally pleasant weather.
Serious dangerous conditions remained present. They included exposed 'wiring in the boiler room and an illegal flexible hose connection for a gas line in the hallway of the public hallway. The latter could easily lead to an explosion in the event of a fire in the hallways, which code enforcement records showed were often subject to violations for accumulations of rubbish. Numerous violations existed in the apartments.
Security was also an extremely serious problem. An open space in the wall between the basement of the first floor bar and the boiler room allowed persons to leave the bar in order to sleep in the basement. It was obvious from a bed in the basement and remnants of clothing and personal articles that the basement was often used in this fashion. Such persons undoubtedly had produced the fecal matter in the rear yard and had been able to secure access to the public parts of the dwelling portion of the building.
*848 The tenants, corroborated by code enforcement records, established that there has been a deprivation of heat. They have paid heat bills. They presented a notice from Consolidated Edison which threatened discontinuance of electrical service for nonpayment of the account by the owner, after receipt of which they had started to pay the utility bills. The tenant payments for heat and utilities are authorized to be treated as rental payments, respectively, under section 302-c of the Multiple Dwelling Law and section 235-a of the Real Property Law.
CHALLENGE TO TENANTS’ PETITION FOR FAILURE TO PROVIDE AN ESTIMATE OF CORRECTION COSTS
The owner challenges the adequacy of the petition in that the tenants have not provided an estimate of correction costs. Before the recent amendment to RPAPL 772, which specifies the required contents of a petition, such a defect would be fatal. However, subdivision 3 of that section was revised by chapter 877 of the Laws of 1982 to require that the petition shall: “Allege a brief description of the nature of the work required to remove the condition and an estimate as to the cost thereof except that if the petitioners shall he tenants occupying the dwelling, the petition may allege the conditions complained of in which event such description shall not be required to be made by anyone not a party to the petition.” (Emphasis added.) Although the statutory phrasing is inartful, it is expected that tenants would not have the competence to provide estimates of correction cost and they are clearly excepted from a requirement that any other person provide a description of the conditions at issue. The amended language leads to the single conclusion that if the petition is brought by the tenants a “cost out” need not be provided. Given that there is no legislative history regarding the amendment to this subdivision and that there is only one available interpretation, that construction is adopted by the court for to do otherwise would defeat the will of the Legislature.
STANDARDS TO BE USED IN ARTICLE 7-A PROCEEDINGS
The owner’s major contention is that the building is not in sufficiently poor condition to warrant the appointment of an administrator. In plain English, the respondent asks: “Is this building bad enough?”
*849 As is true of any analysis, one must examine the question, as well as the possible answers and their supporting rationales. The starting point here is the legislation itself.
The statutory standard in RPAPL 770 (subd 1) is based upon the existence, even if for a very short time, of “dangerous” conditions. In order to grant article 7-A relief, a court must conclude: “there exists * * * a lack of heat or of running water or of light or of electricity or of adequate sewage disposal facilities, or any other condition dangerous to life, health or safety, which has existed for five days, or an infestation of rodents, or any combination of such conditions; or course of conduct by the owner or his agents of harassment, illegal eviction, continued deprivation of services” (emphasis added). Once such a finding is made, the next steps are directed by the statute itself. Article 7-A is not a statute which is replete with discretion, as a close reading indicates.
Assuming that there is no issue regarding the propriety of service of the petition, unless the respondents establish one or more of the defenses outlined in RPAPL 775 or unless the petitioners fail to demonstrate the conditions qualify under the statute, RPAPL 776 states that the court “shall” enter a judgment consistent with the statute. The single exception is that a person with an interest in the property may make an application to correct the conditions and, if that application is granted, an order directing correction may be issued “in lieu of rendering judgment”, although a judgment may issue upon the failure of timely or complete compliance with the order. (See RPAPL 777.)
In order to determine whether dangerous conditions exist, courts generally consider housing violations placed by the municipal department charged with the enforcement of the housing maintenance laws, as well as conditions found to exist which would meet that standard. For a discussion of the possibility of finding such deficiencies in a “luxury” building, see Himmel v Chase Manhattan Bank (47 Misc 2d 93, 98), which is more frequently read for the recitation of the statutory purposes behind article 7-A and its upholding of the constitutionality of the article.
The emphasis upon violations of the housing code was stressed in Kahn v Riverside Syndicate (34 AD2d 515,516): *850 “The legislative intent looks to relief in cases of unusual circumstances and neglect by a landlord. Significantly the tenants were unable to establish any violation of record against the property * * * At best the conditions complained of were transitory and sporadic. This record presents a factual situation unfortunately commonplace in * * * the City of New York and remediable well within the prior existing statutory scheme through numerous specialized housing and other municipal administrative agencies.” (Emphasis added.) This opinion was written in 1970, shortly before the enactment of the New York City Housing Court Act expressed the will of the Legislature that the Civil Court dedicate its efforts to the correction of housing conditions and act to deter and prevent the erosion of the city’s housing stock. (See CCA 110, originally enacted as L 1972, ch 982, eff April 1, 1973.)
The court now has the guidance of a system of classification of housing code violations by degree of danger. As a part of the Housing Court Act, the Legislature created classifications which are set forth in section D26-51.01 (subd [d]) of the Administrative Code. Class B violations are those which have been found by the housing inspectors to be “hazardous” and class C violations have been found to be “immediately hazardous”.
The Legislature has set strict standards to govern correction of such violations and to penalize failures to correct them. Both hazardous and immediately hazardous violations are subject to limited times to correct of 30 days and 24 hours, respectively. Both are subject to per diem penalties, set at $10 and $25 a day, respectively.
With this background, the landlord’s argument that multiple and continuing class B violations are not significant enough to support a 7-A finding must fail. The Legislature has indicated that it considers both class B and class C violations to be matters of serious concern. A condition classified as “hazardous” is certainly “dangerous”, both in plain English and in law.
Based upon this analysis, this building, the subject of 76 violations of record, is “bad enough” to qualify for 7-A relief for conditions exist which endanger life, health and safety. There is no doubt that the court and the attorneys *851 have seen worse buildings, but a finding that the conditions found here are not sufficiently “unusual” would deprive the tenants of the protections to which they are entitled under law only because attorneys and Judges have become jaded by exposure to even worse housing. The tenants have made the necessary affirmative showing and the court is required, by the plain mandatory language of the applicable statute, to grant the judgment absent a statutory reason not to enter such judgment.
DEPRIVATION OF ESSENTIAL SERVICES AS GROUND FOR A 7-A PROCEEDING
A second ground for relief has also been presented here. Article 7-A now provides that an administrator may be appointed for a deprivation of services. (See L 1982, ch 877, eff July 29, 1982.) Such a deprivation has been present here, with the result that the tenants have paid for heating bills.
Little legislative history guides the court in the application of this new provision. It does appear, as set forth in the legislative memorandum of the City of New York in support of the underlying bill, that this expansion of the basis for article 7-A relief was grounded upon the following theory: “a course of conduct by the owner of his agents of harassment, illegal eviction, or other act can be a condition dangerous to life, health or safety.” (NY Legis Ann, 1982, p 283.) The amendment itself is straightforward, but it may cause some difficulty in determining when to terminate an administratorship for the statute has not been amended to integrate this ground into the basis for conclusion of 7-A relief, which remains conditioned upon the completion of repairs.
POSSIBLE COMPLIANCE BY OWNER
Under RPAPL 777, the owner may be permitted to undertake the correction of dangerous conditions, provided that adequate assurance of correction is given. Based upon the inspection, and after considering the number of months in which the owner had to comply with an outstanding order to correct these conditions, the court does not find that the owner’s assurances regarding prospective correction of violations are convincing.
*852 In this case, the owner has shown neither the inclination nor the intention of correcting violations. It is extremely unfortunate that the chief operating officer of the corporate owner appears to be unaware of the hazards present, with an unawareness perhaps brought on by her age.
ADMINISTRATOR AS TEMPORARY MEASURE
A diligent administrator may well be able to remove the conditions noted above within several months and by then will certainly be able to provide a schedule for the correction of any remaining violations or necessary maintenance. The tenants recognize that the duration of the appointment may be limited to a time period in which the conditions found to be dangerous are corrected. (See RPAPL 778.) In this situation, the court shall review the progress of the administrator three months after the administrator is appointed.
The administrator shall also be required to comply with the 7-A monitoring program established by the city’s Department of Housing Preservation and Development which monitors the performance of administrators. That unit provides training for newly appointed administrators and reviews monthly accounting and violation correction plans and accomplishments.
Thus, the situation is no longer entirely as it was at the time of Witherspoon v 2103 Amsterdam Realty Corp. (NYLJ, March 5, 1975, p 15, col 8, p 16, col 2) in which it was observed: “One of the weaknesses * * * of the Article 7-A appointments of administrators, is that there is very little, if any, follow-up and check on the work of such administrators. They seem to go on and on”. See, however, Shackelford v 119 Manhattan Corp. (NYLJ, May 20, 1975, p 18, col 4), in which the Judge saw discretion to review and terminate an appointment upon proper facts, in a case involving a building to which the city had taken title through an “in rem” proceeding.
When the physical conditions have been remedied, the court shall consider what assurances might be imposed to guard the tenants from a further deprivation of services. It is strongly suggested that the officers of the corporate owner investigate the possibility of finding a qualified *853 managing agent, although such suggestion was rejected on previous occasions.
The owner’s right to inspect the written accounts of receipts and expenditures of the administrator, granted by RPAPL 779, shall also be included in the order.
CONCLUSION
Based upon the foregoing, the court finds that conditions exist at the subject multiple dwelling which compel the appointment of an administrator pursuant to RPAPL article 7-A.
Counsel are directed to confer and establish a mutually convenient time and date for the presentation of the proposed administrator. Such person will be examined on the record and should be prepared to answer questions relating to training, experience, judgments, bankruptcies, and eligibility for bonding. Counsel for the petitioners is to prepare for presentation at that time an order consistent with this opinion and with the applicable provisions of article 7-A.