OPINION OF THE COURT
Lewis R. Friedman, J.
These two cases are consolidated solely for the purposes of this decision since they involve common questions of law. The petitioners, tenants in 2094-2096 Amsterdam Avenue and 250 Manhattan Avenue, seek the appointment of an administrator pursuant to RPAPL article 7-A. The respondent, the City of New York (the City), acquired title to both properties pursuant to in rem tax foreclosure proceedings; the properties are operated by the City’s Department of Housing Preservation and Development (DHPD). These cases present several questions of first impression. May an article 7-A administrator be appointed to operate a building owned by the City? What obligation does a municipality have to provide essential services to the occupants of buildings acquired by in rem foreclosure?
THE STRUCTURE OF RPAPL ARTICLE 7-A
Article 7-A was enacted in 1965 (L 1965, ch 909) to permit "[o]ne-third or more of the tenants occupying a multiple *631 dwelling in the city of New York” to bring a proceeding for the appointment of an administrator to operate the building. (Matter of Himmel v Chase Manhattan Bank, 47 Misc 2d 93 [Civ Ct, NY County 1965].) A proceeding may be maintained if "there exists in such dwellings or in any part thereof a lack of heat or of running water or of light or of electricity or of adequate sewage disposal facilities, or any other condition dangerous to life, health or safety, which has existed for five days, or an infestation by rodents, or any combination of such conditions; or course of conduct by the owner or his agents of harassment, illegal eviction, continued deprivation of services or other acts dangerous to life, health or safety.” (RPAPL 770 [1]; Maresca v 167 Bleecker, 121 Misc 2d 846 [Civ Ct, NY County 1983]; Lawrence v Martin, 131 Misc 2d 256 [Civ Ct, NY County 1986].)
The administrator collects the rent and "is authorized and empowered in accordance with the direction of the court, to order the necessary materials, labor and services to remove or remedy the conditions specified in the judgment” (RPAPL 778 [1]). The administrator performs "ordinary repairs and maintenance” (RPAPL 778 [1] [a]; Matter of Levine v State Div. of Hous. & Community Renewal, 126 Misc 2d 531, 534 [Sup Ct, NY County 1984]). As this court has previously noted, "[t]he substance of these provisions is to put the administrator in the position of an owner for some purposes.” (Lawrence v Martin, supra, p 258.)
RPAPL ARTICLE 7-A APPLIES TO CITY-OWNED BUILDINGS
The City argues that as a municipality article 7-A is inapplicable to it. Article 7-A applies to "owners” of dwellings. "As used in this article, the term 'owner’ shall mean and include the owner or owners of the freehold of the premises or lesser estate therein, mortgagee or vendee in possession, assignee of rents, receiver, executor, trustee, lessee, agent, or any other person, firm or corporation, directly or indirectly in control of a dwelling, but shall not include a receiver appointed pursuant to section three hundred nine of the multiple dwelling law.” (RPAPL 781.) Since all fee owners are "owners”, the City is an "owner”, having acquired the freeholds of both premises in in rem tax foreclosures.
The only legislative exclusion from the definition of "owner” is certain receivers. "Where the Legislature has listed specific items in a statute, it is the general rule that the express *632 mention of one thing implies the exclusion of other similar things (expressio unius est exclusio alterius). (See People v Malik, 70 Mich App 133.)” (People v Braunhut, 101 Misc 2d 684, 687 [Crim Ct, Queens County 1979].) "A court cannot by implication supply in a statute a provision which it is reasonable to suppose the Legislature intended intentionally to omit; and the failure of the Legislature to include a matter within the scope of an act may be construed as an indication that its exclusion was intended.” (McKinney’s Cons Laws of NY, Book 1, Statutes § 74.)
The RPAPL 781 definition of "owner” is nearly identical to the definition of "owner” in Administrative Code of the City of New York, Housing Maintenance Code, § D26-1.07 (a) (45) (now renum § 27-2004 [a] [45]) and Multiple Dwelling Law § 4 (44). Significantly, the City is not excluded from these sections, which govern the obligations of "owners” to provide services. (See, Lawrence v Martin, supra, p 259.) The City Council and the Legislature have, when they deemed it desirable, provided exemptions for certain owners, including the City, in other housing statutes. (See, Administrative Code, Housing Maintenance Code §§ D26-41.23 [now renum § 27-2108], D26-50.05 [City] [now renum § 24-2112], D26-10.10 [now renum § 27-2009.01], D26-17.05 [now renum § 27-2030], D26-17.10 [now renum § 27-2033], D26-22.09 [now renum § 27-2056], D26-41.23 [New York City Housing Authority] [now renum § 27-2108], Y51-3.0 [e] [2] [f] [City] [now renum § 26-403 (e) (2) (f)].) Clearly, the express exclusion, in section 781, of a single, specific category of receiver from the definition of "owner” was intended by the Legislature as an implied inclusion of all other persons.
Decisions in analogous areas support the finding that the City is an "owner” subject to article 7-A. For example, in City of New York v Rodriguez (117 Misc 2d 986, 988-989 [App Term, 1st Dept 1983]), the court followed an analysis similar to the above and concluded that the City was a "landlord” subject to the warranty of habitability in Real Property Law § 235-b. The Appellate Division, First Department, in Department of Hous. Preservation & Dev. v Sartor (109 AD2d 665), approved that holding when it found article 7-A administrators to be subject to the warranty of habitability just as was the City.
It is unreasonable to conclude that the City, which is subject to the warranty of habitability imposed by Real Property Law § 235-b is immune from the application of RPAPL article 7-A *633 since the statutory language is essentially identical. Real Property Law § 235-b provides that occupants of residential premises shall not be subjected to "conditions which would be dangerous, hazardous or detrimental to their life, health or safety”; RPAPL 769 provides for a judgment "for the purpose of remedying conditions dangerous to life, health or safety”. The same standards of conduct by "owners” is required under both statutes.
The City argues that despite RPAPL 781 it is immune from the application of article 7-A because of the nature of the fee ownership it has acquired. Administrative Code § D17-12.0 (b) (now renum § 11-412 [b]) provides that the City receives a deed giving it title in fee simple absolute and that: "The appointment and tenure of receivers, trustees or any other persons, including administrators under article seven-a of the real property actions and proceedings law, appointed by an order of a court to manage real property, shall terminate when title to such property vests in the city pursuant to the provisions of this title.”
The City concludes that the appointment of a receiver is precluded by that language. The question has not been resolved in a reported case. (The unreported decision annexed to the City’s brief provides no reasons for its terse conclusion that there is "no jurisdiction” to entertain a proceeding under article 7-A. [Dowdell v City of New York, Civ Ct, Bronx County, index No. L & T 20271/82, Trussel, J.].)
The statute simply provides for "termination” of an administrator’s appointment "when title to such property vests in the city”. A simple linguistic analysis shows that the statute deals exclusively with the moment of vesting and does not even purport to speak to the future appointment of article 7-A administrators based upon the City’s own misconduct and neglect.
When the Legislature amended section D17-12.0 (b) in 1976 (L 1976, ch 816) to add article 7-A administrators to the list of those managers whose appointments "terminate”, it made no other references to them. The failure to provide any permanent ban on appointment is strong proof that the only issue addressed in chapter 816 was the termination of preexisting article 7-A administrators after title has vested. Indeed, the memorandum of the City submitted to the Legislature in support of S 8019, which became chapter 816, contradicts the City’s current argument. The bill "would also clarify the effect *634 of the city’s acquisition of property on receivers, trustees and administrators who may have been previously appointed to manage such property” (1976 NY Legis Ann, at 334-335; emphasis added).
The application of article 7-A to the City as "owner” is consistent with court supervision of administrative agencies which is necessary to insure compliance with minimum housing standards. This court is mandated to "employ any remedy, program, procedure or sanction authorized by law for the enforcement of housing standards, if it believes they will be more effective to accomplish compliance or to protect and promote the public interest” (CCA 110 [c]). "It has long been clear that the existence of minimum standards, with no enforcement except by State and city officials is entirely inadequate to insure that those standards are met. (See, e.g., Bar Hous. Corp. v Calhoun, NYLJ, June 16, 1982, p 13, col 2.)” (Whitby Operating Corp. v Schleissner, 117 Misc 2d 794, 799-800, n 9 [Sup Ct, NY County 1982].)
"If this power [of the Department of Housing Preservation and Development of the City of New York to veto a particular proposal of the Housing Court] is exercised negatively by HPD [then] uninhabitable conditions, urban blight and abandonment may be perpetuated; the city and State public policy may be thwarted * * * the credibility of public officials and government is eroded; and more significantly tenants are doomed to live in uninhabitable housing.” (Housing & Dev. Admin. v Ruel Realty Co., 94 Misc 2d 43, 49 [Civ Ct, NY County 1978].)
Administrative Code, title D, chapter 17 (now renum tit 11, ch 4) assures the City that it will receive good title unencumbered by receivers and administrators. A permanent future exemption from the application of RPAPL article 7-A is not required to guarantee that title. In rem tax foreclosures are an aid in collecting real estate taxes. The City has made a policy decision not to sell most residential properties it acquires but to operate them. It should be treated the same as any other property owner when it functions in the nongovernmental role as the operator of residential real estate.
The City should be held to the same standards of conduct which, through DHPD, it seeks to impose on other owners. If the conditions in a building operated by DHPD fail to meet statutory standards, this court will apply the same remedies to the City as the City would request be applied to others. The City, if it allows a building to become or to remain as a slum, *635 should be treated in the same manner it treats other slumlords.
THE CONDITIONS AT THE BUILDINGS
Petitioners’ proof established beyond any doubt the existence of conditions warranting the appointment of article 7-A administrators. The testimony of residents and the exhibits are overwhelming. The tenants credibly testified to the lack of consistent, adequate hot water, the presence of rodents and roaches, leaks from ceilings, broken doorways and a myriad of unrepaired conditions.
The photographs at 250 Manhattan Avenue revealed holes in the walls, missing and broken doors, missing and broken windows, cracked and falling ceilings and graffiti in all of the public areas. There was a general condition of filth. Indeed, in 1983, the City’s own Department of Environmental Protection issued more than 52 violations (one a week) to the City each of which alleged dirty sidewalks, accumulations of rubbish and garbage and broken glass.
The court visited the premises in Artis on the consent of and in the company of all parties. There were numerous conditions dangerous to the life, health and safety of petitioners (RPAPL 770 [1]). The court observed falling and fallen walls and ceilings, leaking water pipes, missing and broken plumbing and electrical fixtures, exposed electrical wires, damaged flooring, and peeling paint. The heating plant had been out of service for days. One tenant needed two umbrellas in her bathroom in order to use the facilities and remain dry; one apartment had no wall between the kitchen and the toilet. The conditions of the buildings, as seen by the court and as testified to by the tenants, is, without doubt, deplorable. Indeed, this court has personally inspected more than 75 buildings during the past two years, often at the request of DHPD when it was seeking the appointment of an article 7-A administrator; this building was, by far, the worst in all respects.
It is outrageous and an affront to a sense of human decency that the City believes the buildings to be in acceptable condition. One of the City’s witnesses described the buildings as "no worse” than most "newly-vested” buildings. While, unfortunately, that may be true, the City had owned one of the buildings for nearly one year and the other for more than six years.
*636 At each of the trials the City did not seriously attempt to refute the proof of the horrendous existing conditions or to argue that it did not know of them. In each case the City offered proof of numerous "open market” repairs which had been authorized to be done by outside contractors. An examination of the documents shows that much of the work which was ordered was not done and, that which was done, was only patchwork, piecemeal repairs. The City’s witnesses conceded the existence of remaining dangerous conditions which must be repaired.
The City offered several defenses. There was proof that the City was "trying hard” to improve the conditions in the buildings. In this regard the Assistant Commissioner of DHPD responsible for the $180 million budget for operation of City-owned buildings testified in Artis that he was "prepared” to authorize up to $6,000 per unit at 2094-96 Amsterdam Avenue for repairs and that the City was "committed” to the reversal of the deterioration of the building. As DHPD has argued before this court on many occasions, article 7-A does not allow "good intentions” as a defense to an article 7-A proceeding. (See, Maresca v 167 Bleecker, supra; RPAPL 775, 776.)
Testimony in both cases was offered to prove the statutory defense that the "condition or conditions alleged in the petition * * * have been removed or remedied.” (RPAPL 775 [a].) The statute places the burden of proof on the owner to "establish” that defense. The court, after a careful review of the work orders and the testimony, finds that the City has failed to meet its burden. Much work was done but there are still conditions "dangerous to life, health and safety” at each of the buildings.
The City also asserts in each case that the court should not appoint a 7-A administrator because the conditions are so bad and expensive to remedy and the rental income is so low that article 7-A administration would be futile. The court is aware that "[t]here is appellate authority upholding a trial court’s decision that conditions may be so dangerous to life, health and safety as to render the building uninhabitable, and appointment of an administrator futile (McGovern v 310 Riverside Corp., 49 AD2d 949 [2d Dept 1975])” (Gomez v South Williamsburg Better Hous. Corp., 129 Misc 2d 542, 543 [Civ Ct, Kings County 1985]). The proof here does not warrant such a conclusion.
While the City normally provides funds to 7-A administra *637 tors through the 7-A Financial Assistance Unit of DHPD, it asserts that it is probably unwilling to provide such funds to any 7-A administrator appointed for these two buildings. Alternatively, the City has argued that the amount of financial assistance, if it were granted, would be inadequate. Although one DHPD functionary testified to the amount of financial assistance that would ordinarily be available, there was no credible proof of how that amount was arrived at. Apparently there are no regulations or standards that govern these applications.
In Artis the City’s position that article 7-A administration may not work is slightly stronger since there had been an article 7-A administrator in the premises prior to the vesting of title. Just because one person is not capable of collecting rent as it comes due or of doing repairs is not a condemnation of all article 7-A administrators.
No detailed, credible income and expense analysis was offered to prove the City’s assertion of futility. This court will not deny petitioners access to article 7-A solely on the City’s speculative assertion that the results would be futile.
As a final defense the City asserts that several of the petitioners in Artis are not "tenants” within the meaning of RPAPL 770. Five of the eight petitioners who testified in Artis are conceded by the City to be lawful tenants. The City’s objection is, therefore, irrelevant. If one third of the lawful "tenants occupying a dwelling” join the application, the statute’s jurisdictional threshold is met. If the disputed occupants are excluded as "tenants”, there are still enough valid petitioners. Based on the credible evidence, the threshold is met.
The court notes that even the disputed occupants might well be considered "tenants” under RPAPL 770. The three persons testified that after they moved in they each promptly notified the City’s manager of the property that they had done so. No rent was tendered or demanded. Months passed, in one case over nine months. Some repairs were done by DHPD personnel in those occupants’ apartments. No proceedings were brought to evict any of them. The acts of the City may well be sufficient to provide those occupants with sufficient rights that they cannot be allowed to suffer. (See, Kassover v Gordon Family Assoc., 120 Misc 2d 196 [Civ Ct, Kings County 1983] ; Fish v Simpson, 124 Misc 2d 496 [Civ Ct, NY County 1984] ; 2 Rasch, New York Landlord & Tenant — Summary Proceedings § 1189 [2d ed]; compare, Various Tenants of 515 E. *638 12th St. v 515 E. 12th St., 128 Misc 2d 235, 238 [Civ Ct, NY County 1985] [broadly interpreting the term "tenant” in Administrative Code § D26-51.01 (h) (now renum § 27-2115 [h]), which governs the right to seek injunctions for repairs].)
CONCLUSION
The court finds that the City has allowed the buildings at issue to deteriorate, in one case for years. The work it has done is slipshod and faulty. The conditions of the buildings qualify them as slums. The City has become the landlord of last resort for the homeless and others. These cases show that it has also become the slumlord of last resort.
The City alleges that these buildings are typical of the property which has come into its hands as a result of in rem tax foreclosures. The City has chosen to retain them under "central management” rather than dispose of them. Unfortunately, the "management”, or more precisely mismanagement and neglect testified to in these cases may also be "typical”.
The placement of homeless families was eloquently described in McCain v Koch (127 Misc 2d 23 [Sup Ct, NY County 1984]). "Providing a homeless family with a hotel room — often a cubicle in a crumbling plaster palace, or in rooms infested with vermin, with filthy bedding, children sleeping on the floor for lack of cribs, an entire family sleeping on one bed, exposed electrical wires and rooms soiled by human waste are unacceptable shelter for anyone, and especially families with young children. The equitable powers of this court may be invoked to compel compliance with minimal standards. If convicted criminals have such rights, the homeless who become interim wards of a governmental entity are entitled to no less.” The proof revealed that the petitioners here are living under conditions similar to those described by Justice Greenfield. Many of the City’s "tenants” are essentially homeless even though they have a roof and four walls.
Petitioners have struggled to find a place to live in buildings owned by a "responsible” landlord; they deserve an opportunity to have their living quarters brought up to minimal levels of decency. The 7-A program is not a panacea and has been subjected to severe criticism by this court among others. Yet, it is hard to believe that an administrator can produce results as bad as the City’s "management” in these two cases. The homeless have acquired eloquent spokespersons who *639 speak for the hapless residents of dilapidated City-owned housing.
Each application for the appointment of a 7-A administrator is granted. Settle orders on notice with names of proposed administrators.